IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FILED 14 DEC '11 17:16 USDC-ORE

EUGENE DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

     v.

HAROLD RAY BETTENCOURT
II, KATHY SUE ("SUSIE")
BETTENCOURT, HAROLD RAY
("BO") BETTENCOURT III,
NICHOLAS ("NICK") RYAN
BETTENCOURT , PETER
("PETE") TRACY
BETTENCOURT, MARGO
ANTONETTE ("TONI")
DENSMORE, JOSHUA ("JOSH")
LEE KEMP, AND KUSTOM
PRODUCTS, INC. ("KPI"),

          Defendants.

Case No. CR 11- (o0 142-HO

**I N D I C T M E N T**

[18 U.S.C. §§ 38(a)(1)(C) & (b)(4) (fraud
related to aircraft parts), 981(a)(1)(C),
982(a)(1) & (b) (criminal forfeiture), 1343
(wire fraud), 1349 (conspiracy to commit wire
fraud); 1956(h) & 1957(a), (b)(1), (d)(1),
(money laundering), and 1961(1); 21 U.S.C. §
853(p); and 28 U.S.C. § 2461(c)]

**THE GRAND JURY CHARGES:**

**COUNT 1**
**[CONSPIRACY TO COMMIT WIRE FRAUD]**

Beginning at an undetermined time and continuing through December 1, 2010, in the

District of Oregon and elsewhere, defendants Harold Ray Bettencourt II, Kathy Sue (Susie)

Bettencourt, Harold Ray (Bo) Bettencourt III, Nicholas (Nick) Ryan Bettencourt, Peter (Pete)

Tracy Bettencourt, Margo Antonette (Toni) Densmore, Joshua (Josh) Lee Kemp and Kustom

Products, Inc. (KPI) did knowingly conspire, confederate and agree with each other and with other

persons known and unknown to the grand jury to commit wire fraud in violation of Title 18, United

States Code, Section 1343, to wit, having devised and intended to devise a scheme and artifice to

1 - INDICTMENT

defraud the United States Department of Defense (DoD) and to obtain money and property from the DoD by means of materially false and fraudulent pretenses, representations and promises, well knowing at the time that these pretenses, representations and promises would be and were false and fraudulent when made, defendants transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice to defraud and to obtain money and property.

**At all times relevant to this indictment:**

**A.    The defendants:**

1.    **Defendant Kustom Products, Inc., (KPI)** was a vehicle parts supply business located at 1084 South 5th Street, Coos Bay, Oregon.  It was formed on January 1, 2010 from the merger of three predecessor companies:  Bettencourt Transportation Services, Inc. (BTS), Kustom Truck and RV, Inc. (KTRV), and Southern Oregon Sterling Parts and Service (SOS). Upon merging into KPI on January 1, 2010, BTS, KTRV and SOS legally dissolved, and KPI became their successor in interest.  Beginning at an undetermined time and continuing through December 1, 2010, defendant KPI and its predecessor SOS supplied nonconforming, defective and counterfeit parts to the DoD contrary to contract requirements.   In doing so, defendant KPI and its predecessor SOS underbid competitors, provided less-expensive products, and obtained substantial profits.  During the course of the offense, defendant KPI and its predecessor SOS provided nonconforming, defective and counterfeit products to the DoD on at least 392 contracts, receiving $7,523,406.59 in payments from the DoD on those contracts.   All payments were made via Electronic Funds Transfer (EFT) to bank accounts held by defendant KPI and its predecessor SOS.

2 - INDICTMENT

2.      **Defendant Harold Ray Bettencourt II** was the owner, chief executive officer and general manager of defendant KPI and predecessor companies BTS, KTRV, and SOS. He was responsible for managing the general operation of defendant KPI and its predecessor companies. This involved responsibility for all administrative, financial, personnel, sales and service matters. He facilitated the scheme and artifice to defraud the DoD and to obtain money and property from the DoD by directing other defendants to carry out certain actions on behalf of defendant KPI and its predecessor SOS. Among other things, he directed defendant Susie Bettencourt to make payments, including wire transfers, to non-approved sources of nonconforming, defective and counterfeit parts. He also directed defendants Bo Bettencourt, Nick Bettencourt, Pete Bettencourt, Toni Densmore and Josh Kemp to do the following:

      a.      make false representations in bid quotations,

      b.      make false representations in contracts,

      c.      obtain products from non-approved sources of supply,

      d.      provide non-conforming and counterfeit products,

      e.      provide false and fictitious invoices, purchase orders and traceability documents, and

      f.      provide false explanations in response to inquiries from the DoD.

3.      **Defendant Susie Bettencourt** was an employee of defendant KPI and its predecessor companies. She was the office manager and responsible for administrative and financial matters. This included responsibility for all payables and receivables, and supervision of administrative personnel. As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, she made payments, including wire transfers, to non-approved sources of nonconforming, defective and counterfeit parts.

3 - INDICTMENT

4.    **Defendants Bo Bettencourt, Nick Bettencourt and Pete Bettencourt** were employees of defendant KPI and its predecessor companies.    Defendants Bo Bettencourt and Nick Bettencourt were also sales managers of defendant KPI and its predecessor companies. Defendants Bo Bettencourt, Nick Bettencourt and Pete Bettencourt were responsible for contract fulfillment which involved the submission of contract bid quotations, acquisition and supply of parts to fulfill contracts, and communication with persons involved in the contracting process.    As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, they did the following:

        a.    made false representations in bid quotations,

        b.    made false representations in contracts,

        c.    obtained products from non-approved sources of supply,

        d.    provided non-conforming, defective and counterfeit products,

        e.    provided false and fictitious invoices, purchase orders and traceability documents, and

        f.    provided false explanations in response to inquiries from the DoD.

5.    **Defendant Toni Densmore** was an employee of defendant KPI and its predecessor companies.    She was responsible for contract fulfillment which involved the submission of contract bid quotations, acquisition and supply of parts to fulfill contracts, and communication with persons involved in the contracting process.    She also managed administrative matters and was responsible for defendant KPI's information technology.    As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, she assisted other defendants in contract fulfillment involving non-conforming, defective and counterfeit products, and she

created software templates to assist in providing false and fictitious invoices, purchase orders and traceability documents.

6.    **Defendant Josh Kemp** was an employee of defendant KPI and its predecessor companies.  He was a purchasing agent and responsible for all aspects of contract fulfillment which included coordinating product acquisition, logistics and communication with persons involved in the contracting process.  As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, he assisted other defendants in contract fulfillment involving non-conforming, defective and counterfeit products, and he provided false explanations in response to inquiries from the DoD.

**B.    The procurement process**:

1.    The Defense Logistics Agency (DLA) was a component of the DoD and located in Fort Belvoir, Virginia.  The DLA provided the DoD with worldwide logistics support by supplying the United States military with equipment, supplies and services.  United States military units would request equipment and parts from the DLA for repair and maintenance of United States military aircraft, vehicles, naval vessels and weapons systems, among other things. These requests were filled through purchase orders (contracts) awarded to DoD contractors through one of three DLA buying centers:  the Defense Supply Center Columbus located in Columbus, Ohio (DSCC), the Defense Supply Center Philadelphia (DSCP) located in Philadelphia, Pennsylvania, and the Defense Supply Center Richmond (DSCR) located in Richmond, Virginia.  Some of the products procured by the DLA were critical application items, defined as items essential to weapons systems performance or operation, or the preservation of life or safety of operational personnel.

2.    The Tank Automotive and Armaments Command (TACOM) was a component of

5 - INDICTMENT

the United States Army, headquartered in Warren, Michigan with multiple satellite sites throughout the United States. Among other things, TACOM provided repair parts and services for combat and tactical vehicles.

3.     The basic contracting rules for all federal government agencies were set forth in the Federal Acquisition Regulations (FAR). Additional rules unique to the DoD were set forth in the DoD FAR Supplement (DFARS). All contractors for the federal government were required to register with the Central Contractor Registration (CCR), the primary registrant database for federal contractors, including DoD contractors. Prospective contractors were required to provide, among other things, a company name, address, telephone number and an email address for electronic correspondence with the contracting commands. Prospective contractors were also required to agree to receive payment on all federal contracts via Electronic Funds Transfer (EFT). Once an entity registered with the CCR and was approved to do business with the federal government, the entity was assigned a unique five-digit identification number called a Commercial and Government Entity (CAGE) code. The CAGE code was used to identify entities bidding on government contracts. The CAGE code was also used to identify entities awarded contracts to provide supplies and services.

4.     Most of the contracts awarded by the DoD were processed through the full and open competitive bidding process using Simplified Acquisition Procedures (SAP). Using SAP, the contracting entity posted a Request for Quotation (RFQ). The RFQ would contain details of the item to be procured, including whether the item was a critical application, and would affirm that the quotation must be submitted via DLA Internet Bid Board System (DIBBS) or the Army Single Face to Industry (AFSI) on-line Bid Response System (BRS). The DIBBS and the AFSI BRS were Web-based applications that enabled the vendor community to search for, view, and

6 - INDICTMENT

submit secure bid quotations in response to RFQs. The RFQ would also affirm whether the Buy American Act (BAA) applied to quotations. The BAA restricted the purchase of supplies to domestic end products.

5.     Regarding the details of the item to be procured, the RFQ would contain the National Stock Number (NSN), part number(s), manufacturer(s) of the part(s), if applicable, and a description of the item(s), including whether it was a critical application. The RFQs would contain all DoD approved sources of supply, since parts from these sources had been tested and validated as meeting the needs of the land, maritime, and aviation supply chains. In RFQs for specific products, the RFQs would contain an explanation that when the contract described the required product(s) by name and part number of a specific manufacturer and/or supplier, only those product(s) would be acceptable because only those products had been determined to meet the needs of the DoD. The RFQ would also explain that when a contractor bid "without exception" it would be a certification that the "exact product" would be furnished under the contract. The RFQ would inform the contractor that any product not manufactured and/or supplied by one of the entities cited in the RFQ was an "alternate product." The RFQ would then inform the contractor that if an alternative product was furnished under a contract for an exact product, the alternate product would be an unauthorized substitution, and may yield criminal and/or civil penalties.

6.     Some RFQs were restricted to "small business set asides" which meant that bidding was only open to small businesses as determined under criteria established by the United States Small Business Administration (SBA). Generally, RFQs for supplies or services with an anticipated dollar value of more than $3,000 but less than $100,000 were set aside for small businesses.

7 - INDICTMENT

7. Quotations submitted to the DLA were processed through DIBBS and ASFI BRS. Using their CAGE code and password, contractors would log into DIBBS and ASFI BRS and complete an electronic quote form. The electronic quote form would then be submitted to the DLA and TACOM in response to RFQs. Unless an item was described by drawings or specifications, the contractor was required to input the manufacturer's CAGE code and part number of the item bid upon as listed in the RFQ. The contractor would then bid "without exception," or "with exception." As explained previously, when a contractor bid "without exception" it meant that the "exact product" would be furnished under the contract. If a contractor bid "with exception," it meant that the contracting official could choose to modify the terms of the proposed contract, based on a proposed exception or alternate offer. Only certain categories of products qualified for bids with exceptions. All secure bid quotations on RFQs via DIBBS and ASFI BRS were submitted via secure web communication.

8. Certain solicitations were candidates for an award under the Defense Supply Centers' (DSC) Procurement Automated Contract Evaluation (PACE) program. PACE used pricing logic and other automated filters to make fully automated and buyer assisted automated awards of $25,000 or less. PACE only considered "qualified quotes" for an award. Qualified quotes were in exact compliance with the solicitation requirements - bids "without exception," were $25,000 or less in total quoted price, and were submitted by the return date and time specified in the solicitation. PACE evaluated, objectively, all qualified quotes on price alone. In the event there were multiple lowest bidders with the same quote, the quote that had the shortest delivery time received the award. If there were no qualified quotes, or PACE was unable to make price reasonableness or contractor responsibility determinations, the quote would be rejected from PACE in order for it to be manually evaluated and awarded.

8 - INDICTMENT

9.      Contracts awarded by the DLA were processed via DIBBS.  Contracts awarded by TACOM were processed via ASFI BRS.  As explained in the RFQs and the secure bid quotation forms, when contracts specified the required product(s) and manufacturer(s) and/or supplier(s), only those product(s) would be acceptable.  The actual contracts would also include an explanation that a bid "without exception" would be a certification that the "exact product" would be furnished under the contract.  The contract would include a provision that any product not manufactured and/or supplied by the specified entities was an "alternate product."  The contract would also include a provision that if an alternative product was furnished under a contract for an exact product, the alternate product would be an unauthorized substitution, and may yield criminal and/or civil penalties.  The contract would include a number of other provisions, including various shipping related requirements and whether domestic end products were required.

10.     Certain contracts required that items be shipped in wood packaging material (WPM).  All WPM used to make shipments under DoD contracts were required to meet International Standards for Phytosanitary Measures (ISPM) 15, "Guidelines for Regulating Wood Packaging Materials in International Trade."  All WPM used to make shipments under DoD contracts were also required to comply with the heat treatment (HT) in accordance with the American Lumber Standard Committee, Inc. (ALSC) WPM Program and WPM Enforcement Regulations.  In order to show compliance with these regulations, all WPM used to make shipments under DoD contracts were required to include certification quality markings readily visible to inspectors.

11.     The Defense Finance and Accounting Service (DFAS) was the financial and accounting organization for the DoD.  One of the services provided by DFAS was the payment of DoD contracts. Upon shipment or delivery of the supplies, the contractor would submit an

9 - INDICTMENT

electronic invoice which represented to the DoD that the parts shipped met the requirements of the contract.   Upon receipt of the electronic invoice, the contractor was paid by DFAS via EFT.

12.    Throughout the contracting process with the DLA and TACOM, defendants used and caused to be used wire communications in interstate and foreign commerce.   In submitting bid quotations to the DLA and TACOM for contracts with the DoD, defendants would and did make the following representations:

> a.    that defendants would furnish the "exact product(s)" specified in the contracts;

> b.    that defendants would comply with the Buy American Act and supply domestic end products;

> c.    that defendants would comply with regulations pertaining to heat treatment of wood packaging materials.

These representations were material in that they would and did cause the DLA and TACOM to award DoD contracts to defendant KPI and its predecessor SOS.   Once contracts were awarded to defendant KPI and its predecessor SOS, defendants would and did do the following while purporting to comply with the DoD contracts:

> a.    provide nonconforming, defective, and counterfeit products to the DoD;

> b.    provide foreign non-approved nonconforming and counterfeit products from China and Mexico to the DoD in violation of the Buy American Act;

> c.    provide counterfeit heat treatment certifications for wood packaging materials in violation ISPM 15, "Guidelines for Regulating Wood Packaging Materials in International Trade" and the ALSC WPM Program and Enforcement Regulations;

    d.    provide false information to federal quality assurance inspectors and other federal officials in order to conceal their scheme;

**C.**    **As a part of this scheme and artifice to defraud:**

    **1.**    **Defendant KPI provided defective aviation locknuts for the OH-58 A/C ("Kiowa") helicopter:** As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, defendant KPI provided defective aviation locknuts for the Kiowa helicopter. The aviation locknuts were a critical application, essential to weapons systems performance or operation, or the preservation of life or safety of operational personnel.

    a.    On January 7, 2008, the Defense Supply Center Philadelphia (DSCP), Aviation Detachment (AD), issued an RFQ for a critical application item, 950 self-locking aviation nuts. The RFQ identified two approved sources of supply: Bristol Industries, part number BH00935-14, and SPS Technologies, part number EB9025-14. On January 9, 2008, the DSCP/AD issued an additional RFQ for more of the same critical application item, 286 self-locking aviation nuts. The second RFQ identified the same two approved sources of supply: Bristol Industries, part number BH00935-14, and SPS Technologies, part number EB9025-14.

    b.    On January 18, 2008, defendant Nick Bettencourt sent an email message to Coloc Manufacturing (Coloc), a locknut manufacturer located in Canton, Texas. The email message requested that Coloc provide defendant KPI with a price quote for a quantity of 950, 12-point flange locknuts, and a second order for 286, 12-point flange locknuts. The email communication contained an attached drawing with specifications for the part defendant KPI sought to acquire. On January 21, 2008, Coloc faxed a price quote back to defendant KPI, which identified "Harold/Nick" as the buyer. At no time did

11 - INDICTMENT

defendants Harold Ray Bettencourt II or Nick Bettencourt inform Coloc that the locknuts were to be provided to the DoD. Coloc was not an approved source of supply for the DoD.

c.      On January 21, 2008, at 7:02 p.m. EST, using the DIBBS program, defendant KPI through employee Denis Hickey submitted a bid to supply DoD with 950 SPS Technologies part number EB 9025-14 self-locking aviation nuts at $19.89 per unit, for a total bid amount of $18,895.50. On the same date at 7:05 p.m. EST, using the DIBBS program, defendant KPI through employee Denis Hickey submitted a bid to supply DoD with 286 SPS Technologies part number EB 9025-14 self-locking aviation nuts at $23.80 per unit, for a total bid amount of $6,806.80. Each bid was submitted "without exception," stating that the "exact product," SPS Technologies part number EB 9025-14 self-locking aviation nut with extended washer, would be provided to the DoD.

d.      On January 24, 2008, defendant KPI was awarded an automated contract issued by DSCP/AD for the supply of 286 self-locking aviation nuts (contract I). The value of contract I was $6,806.80 to supply 286 locknuts at $23.80 each. One section of contract I contained descriptive information about the exact product to be supplied which identified the item as a "critical application," and further identified two approved sources of supply: Bristol Industries, part number BH00935-14, and SPS Technologies, part number EB9025-14.

e.      On January 28, 2008, Coloc received an email communication from defendant KPI through defendant Josh Kemp, which stated "Dick, Here is an order for you. Please confirm delivery date and order. Please call if you have any questions." Attached to defendant Josh Kemp's email message was a purchase order from defendant KPI, dated

12 - INDICTMENT

January 28, 2008, for the purchase of 286 self-locking nuts, Coloc part number 12PT968740-1414NL, at $13.40 each.

f.      On February 20, 2008, KPI was awarded a contract issued by DSCP/AD to supply 950 self-locking aviation nuts (contract II).   The terms of contract II were exactly the same as contract I except that it was for 950 locknuts at $19.89 each for a total award of $18,895.50.

g.      On February 29, 2008, Coloc received a facsimile from defendant KPI through defendant Josh Kemp containing a purchase order for 950 self-locking nuts, and an email from defendant KPI through defendant Josh Kemp with an attached purchase order for 286 self-locking nuts.   Both purchase orders were for the acquisition of Coloc part number 12PT968740-1414NL, not Bristol Industries part number BH00935-14 or SPS Technologies part number EB9025-14.   The quantities of locknuts identified on the purchase orders were the exact quantities requested on contracts I and II.   The unit price for each locknut was $11.00.   By ordering nonconforming locknuts from Coloc instead of an approved source of supply, defendant KPI had product mark-ups on contracts I and II of approximately 116% and 81%, respectively.

h.      Defendant KPI provided the nonconforming locknuts to the DoD representing them to be those specified in contracts I and II.   Between June 10 and June 16, 2008, DFAS initiated EFTs to defendant KPI for $6,806.80, the amount awarded on contract I for 286 Bristol Industries or SPS Technologies locknuts.   Between June 17 and July 1, 2008, DFAS initiated EFTs to defendant KPI for $18,895.50, the amount awarded on contract II for 950 Bristol Industries or SPS Technologies locknuts.

13 - INDICTMENT

i.    On April 23, 2008, defendant KPI was awarded an additional automated contract issued by DSCP/AD to supply 675 self-locking aviation nuts (contract III).   The value of contract III was $13,594.50, to supply 675 locknuts at $20.14 each.   Contract III called for the same two approved suppliers as referenced in contracts I and II.   On April 25, 2008, Coloc received a facsimile from defendant KPI through defendant Josh Kemp containing a purchase order for the acquisition of 675 locknuts, Coloc part number 12PT968740-1414NL.   The unit price for the purchase of each locknut was $11.00.   By ordering nonconforming locknuts from Coloc instead of an approved source of supply, defendant KPI had a product mark-up on contract III of approximately 83%.   Defendant KPI provided the nonconforming locknuts to the DoD representing them to be those specified in contract III.   Between July 7 and September 23, 2008, DFAS initiated EFTs to defendant KPI for $13,594.50, the amount awarded on contract III for 675 Bristol Industries or SPS Technologies locknuts.

j.    On June 23, 2008, defendant KPI was awarded an automated indefinite delivery type of contract by DSCP/AD to supply self-locking aviation nuts (contract IV). Since contract IV was an automated indefinite delivery type award, the procurement command could place additional orders under the same contract without a new solicitation order for a period of one year, with a second year option.   On June 24, 2008, defendant KPI was awarded the first delivery order (DO) under contract number IV.   The value of the DO was $16,168.00, to supply 752 locknuts at $21.50 each.   The DO required the same two approved suppliers identified in contracts I-III.   Rather than order the specified part from an approved source of supply, on June 26, 2008, defendant KPI through defendant Josh Kemp faxed to Coloc a purchase order for the acquisition of 752 locknuts,

Coloc part number 12PT968740-1414NL. The unit price for the purchase of each locknut was initially $11.00 but the cost was increased to $13.33 a unit, due to the part being modified by Coloc at the request of defendant KPI. By ordering nonconforming locknuts from Coloc instead of an approved source of supply, KPI had a product mark-up on the DO under contract IV of approximately 61%.

k.     On August 28, 2008, the Kentucky Army National Guard (KANG) issued a Product Quality Deficiency Report (PQDR) after identifying eight defective aviation locknuts while military personnel were attempting to install the parts on a Kiowa helicopter. The report revealed these locknuts were flight critical and were used on the main rotor assembly of the Kiowa helicopter. The locknuts were flight critical because the failure of the main rotary assembly could be catastrophic, resulting in death or serious injury to military personnel. The locknuts were acquired by the DLA from defendant KPI under contract II.

l.     When contacted about the PQDR, defendant KPI provided the Defense Contract Management Agency (DCMA) with a letter dated September 15, 2008, signed by defendant Josh Kemp, which stated that defendant KPI inspected one of the parts the military sent back to defendant KPI and concluded the product supplied was incorrect. Defendant KPI stated that the cause of the deficiency was "the receiving department placed the incorrect part into the correctly (sic) part numbered inventory bin." The correspondence further stated that defendant KPI would request that the receiving department conduct a bin check on SPS part number EB9025-14 (although defendant KPI had never ordered SPS part number EB9025-14).

15 - INDICTMENT

m.     When the PQDR was issued on August 28, 2008, defendant KPI had been awarded but had not yet completed the DO under contract number IV for 752 of the same aviation locknuts.  After being notified of the PQDR, rather than acquire the 752 locknuts from one of the approved sources of supply, Bristol Industries or SPS Technologies, defendant KPI contacted Coloc and had them modify the nonconforming part to more closely resemble the specified part.  Defendant KPI then supplied an additional 752 nonconforming locknuts.   Between November 19 and November 24, 2008, DFAS initiated EFTs to defendant KPI for $16,168.00, the amount awarded on the DO under contract IV for 752 Bristol Industries or SPS Technologies locknuts.  Rather than disclose that nonconforming defective parts were provided in the DO, defendant KPI retained the $16,168.00 and continued its scheme and artifice to defraud the DoD and to obtain money and property from the DoD without regard for the safety of military personnel.

n.     On February 9, 2009, KPI was awarded a second DO under contract IV (contract V).   Contract V was for the acquisition of 361 self-locking aviation nuts to be filled from the same two approved sources of supply as referenced in the previous DO, Bristol Industries, part number BH00935-14, or SPS Technologies, part number EB9025-14, as well as a third supplier, Bell Helicopter Textron (the manufacturer of the Kiowa helicopter).  Bell Helicopter Textron's part number was 5310-OH-58-001.  The total amount of contract V was $8,519.60, or $23.60 per unit.  Although defendant KPI was already warned by DoD officials that Coloc was not an approved source of supply, defendant KPI again contacted Coloc to supply nonconforming self-locking aviation nuts.

o.     On or about February 20, 2009, Coloc received a purchase order transmitted via facsimile from defendant KPI through defendant Josh Kemp for the acquisition of 361

16 - INDICTMENT

self-locking aviation nuts 12PTNL998740HR-1414Z at a unit price of $13.33. By ordering nonconforming locknuts from Coloc instead of an approved source of supply, defendant KPI had a product mark-up on contract V of approximately 77%.

      p.    On April 8, 2009, defendant KPI through defendant Nick Bettencourt contacted a representative of Cade Technologies via email to order one SPS Technologies EB9025-14 self-locking aviation nut. Cade Technologies was an authorized distributor for SPS Technologies. In the email defendant Nick Bettencourt stated "I need to get one ordered today. Please call me for credit card info as we are not set up on account with you yet." On April 9, 2009, defendant KPI through defendant Nick Bettencourt provided an invoice to Cade Technologies for one SPS Technologies EB9025-14 self-locking aviation nut. On April 10, 2009, defendant KPI through defendant Nick Bettencourt provided another invoice to Cade Technologies for one more SPS Technologies EB9025-14 self-locking aviation nut. Cade Technologies then shipped the two SPS Technologies EB9025-14 self-locking aviation nuts to defendant KPI.

      q.    Upon receiving the two SPS Technologies EB9025-14 self-locking aviation nuts from Cade Technologies, on April 15, 2009, defendant Josh Kemp sent an email to Coloc representatives requesting that Coloc reverse-engineer and re-manufacture the self-locking aviation nuts, using photographs of the authentic products received from Cade Technologies. The email communication stated, in part:

        *. . . We were able to find the other two samples of SPS nuts. Please see attached pictures that show the nut you supplied us (Grey in color) and the sample (yellow in color). The sample nut has a definite radius to the bevel and the one*

17 - INDICTMENT

*you supplied us is clearly a straight bevel. Harold will be contacting you today to discuss this issue further.*

r.      On April 27, 2009, a DCMA Federal Quality Assurance Representative (QAR) requested that defendant KPI provide traceability documentation for the source of the aviation locknuts provided to the military on contracts I-IV.   On April 28, 2009, rather than provide the original purchase orders showing that defendant KPI ordered the locknuts from an unapproved source, defendant KPI through defendant Josh Kemp provided the DCMA QAR copies of false purchase orders representing that defendant KPI ordered the locknuts from its predecessor SOS which was, as explained above, another DoD contractor owned by defendant Harold Ray Bettencourt II.   Defendant KPI through defendant Josh Kemp also provided the DCMA QAR with false purchase orders reflecting the ordering of part number "EB9025-14," while the actual purchase orders issued to Coloc identified the Coloc part number 12PT968740-1414NL.

s.      On May 1, 2009, DFAS initiated an EFT to defendant KPI for $8,519.60, the amount awarded on contract V for 361 Bristol Industries, SPS Technologies, or Bell Helicopter Textron locknuts.

t.      On September 23, 2010, federal agents served search warrants on the business premises of defendant KPI and the personal residences of defendants Harold Ray Bettencourt II, Susie Bettencourt, Bo Bettencourt, Nick Bettencourt, and Pete Bettencourt for evidence of fraud involving aircraft parts, false claims, conspiracy to defraud the United States, false statements, wire fraud, obstruction of justice, and money laundering. The affidavit in support of the search warrants explained that the DoD, Office of Inspector General, Defense Criminal Investigative Service knew that defendant KPI had provided

18 - INDICTMENT

nonconforming defective aviation locknuts under contracts I-V for the Kiowa helicopter in violation of federal law, and that federal investigators were attempting to seize evidence of the criminal violations.

      u.    On October 6, 2010, defendant Harold Ray Bettencourt II sent an email to a DLA representative requesting the return of all self-locking aviation nuts which were the subject of a PQDR. In attempting to acquire and destroy evidence of his fraud, defendant Harold Ray Bettencourt II stated "We unfortunately cannot re-supply the outstanding balance of the unreturned nuts until they are returned to KPI because we have no means of isolating and controlling the non-conforming parts. If we simply re-supply without receiving the defective product back, we have no means of preventing the defective product from getting mixed with the re-supply product and imminently entering the supply chain." As referenced above, the only "conforming" parts ordered by defendant KPI were two SPS Technologies self-locking aviation nuts from Cade Technologies which they only obtained for the purpose of perpetuating the fraud. There was never any danger of such conforming parts "getting mixed with the re-supply product."

      **2.**    **Defendant KPI provided defective clamp loops, including clamp loops used in the TF39 engine thrust reverser system on the C-5 military transport plane and other aircraft:** As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, defendant KPI provided defective clamp loops to the DoD:

      a.    On October 23, 2008, defendant KPI was awarded a contract by the DSCP/AD (contract VI) to supply 180,000 clamp loops. The amount of contract VI was $42,840.00. Contract VI required the parts to domestic end products made to certain specifications. It also required disclosure of the domestic manufacturer. Defendant KPI

19 - INDICTMENT

through employee Flavio Godinez represented to the DoD that Pacific Industrial Components, Inc., in Eugene, Oregon would manufacture the product. Pacific Industrial, Components, Inc., was an approved source, registered with the CCR and assigned a CAGE code. Once contract VI was awarded, however, defendant KPI through defendant Nick Bettencourt outsourced the production of these clamp loops to Anhui Weiwei Rubber Products Co. Ltd. in Tongcheng City, China, an unapproved source of supply. On May 18, 2009 DFAS initiated EFTs to defendant KPI on contract VI totaling $42,840.00.

      b.     On March 14, 2009, defendant KPI was awarded a contract by the DSCP/AD (contract VII) to supply 7,600 clamp loops. The amount of contract VII was $7,068.00. Contract VII required the parts to domestic end products made to certain specifications. It also required disclosure of the domestic manufacturer. These clamp loops were used in the TF39 engine thrust reverser system on the C-5 military transport plane and other aircraft. They were a critical application, essential to weapons systems performance or operation, or the preservation of life or safety of operational personnel. Defendant KPI through employee Flavio Godinez represented to the DoD that Pacific Industrial Components, Inc., in Eugene, Oregon would manufacture the product. Once contract VII was awarded, however, defendant KPI through defendant Nick Bettencourt outsourced the production of these clamp loops to Anhui Weiwei Rubber Products Co. Ltd. in Tongcheng City, China, an unapproved source of supply. Between September 1 and September 4, 2009, DFAS initiated EFTs to defendant KPI on contract VII totaling $7,068.00.

      c.     On December 11, 2009, a DCSP representative sent a letter to defendant Josh Kemp informing him that PQDRs had been issued for clamp loops supplied by

20 - INDICTMENT

defendant KPI on contract VI because they were defective both in dimension and composition. In a responsive communication dated December 15, 2009, defendant Nick Bettencourt claimed that ". . . after double checking with the vendor, we had confirmed that the parts supplied on subject contract were in fact correct. . . ."

       d.      On March 19, 2010, a PQDR was issued for clamp loops supplied by defendant KPI on contract VII because they were defective both in dimension and composition. The PQDR stated that the clamp loops had numerous manufacturing defects that made them unusable for their intended purpose. The rubber was not in compliance with the specifications and the metal had corroded and oxidized. The PQDR noted that defendant KPI was in debarment status and that DoD was investigating the causes of the non-compliance.

       **3.**      **Defendant KPI provided counterfeit Freightliner parts:**   As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, defendant KPI provided counterfeit Freightliner parts to the DoD:

       a.      Between May 26, 2007 and January 27, 2010, defendant KPI was awarded 22 contracts by the DLA and TACOM totaling $548,726.79, to supply Freightliner parts. In each of the contracts, defendant KPI provided counterfeit parts to the DoD, representing them to be Original Equipment Manufacturer (OEM) Freightliner parts in compliance with the contracts. As set forth in the following table, in 14 of the contracts, totaling $414,224.34, defendant KPI obtained the counterfeit parts from Promotora Expormex, located in Tlaquepaque, Jalisco, Mexico. In eight of the contracts, totaling $134,502.45, defendant KPI obtained counterfeit parts from Benz Spring Company in Portland, Oregon. By providing counterfeit parts, defendant KPI had a substantial product mark-up on each

21 - INDICTMENT

contract as set forth in the following tables.   Between September 18, 2007 and March 18, 2010, DFAS initiated EFTs to defendant KPI on contract VI totaling $550,446.83.

b.   On March 3, 2006, in an email communication from defendant Nick Bettencourt to defendant Toni Densmore, defendant Nick Bettencourt requested traceability information from defendant Toni Densmore regarding a quotation she had submitted for defendant KPI to supply Freightliner parts to the DLA.   In a responsive email on that same date, defendant Toni Densmore stated in part ". . . IMPORTANT NOTE:   Per Harold this kit is REALLY going to be through Parts Craft, but we are saying it is from Freightliner . . ."

**PROMOTORA EXPORMEX, COUNTERFEIT FREIGHTLINER PARTS**

| CONTRACT/PO NO. | DATE AWARDED | CONTRACT AMOUNT | PRODUCT MARK-UP | FREIGHTLINER PART # |
|---|---|---|---|---|
| SPM4A6-08-08-V-0989 | 11/20/07 | $ 22,494.08 | 95% | A06-17965-000 |
| SPM4A6-08-D-0044-0001 | 12/10/07 | $ 7,380.87 | 100% | A06-17965-000 |
| SPM7L1-08-V-2128 | 03/19/08 | $ 30,411.05 | 119% | A22-35839-002 |
| SPM7M1-08-V-C712 | 03/26/08 | $ 14,896.50 | 141% | A22-35376-001 |
| SPM5L3-08-M-1831 | 05/02/08 | $ 29,652.00 | 165% | A22-35921-000 |
| SPM7L1-08-M-4845 | 05/09/08 | $ 51,016.71 | 142% | A22-34925-000 |
| SPM4A6-08-D-0044-0002 | 05/19/08 | $ 19,330.85 | 94% | A06-17965-000 |
| SPM7L3-08-C-0037 | 05/19/08 | $ 121,044.00 | 24% | A17-12443-002 |
| SPM5L2-08-M-3394 | 09/06/08 | $ 16,739.52 | 128% | A22-63755-002 |
| SPM7L1-09-M-0251 | 10/10/08 | $ 16,905.60 | 147% | A22-34925-000 |
| SPM4A6-08-D-0044-0003 | 12/05/08 | $ 21,088.29 | 111% | A06-17965-000 |
| SPM4A6-08-D-0044-0004 | 04/15/09 | $ 22,938.14 | 111% | A06-17965-000 |
| SPM4A6-08-D-0044-0005 | 06/01/09 | $ 17,388.59 | 106% | A06-17965-000 |
| SPM4A6-08-D-0044-0006 | 10/03/09 | $ 22,938.14 | 107% | A06-17965-000 |
| **TOTAL** | | **$ 414,224.34** | | |

BENZ SPRING CO, COUNTERFEIT FREIGHTLINER PARTS

| CONTRACT/PO NO. | DATE AWARDED | CONTRACT AMOUNT | PRODUCT MARK-UP | FREIGHTLINER PART # |
|---|---|---|---|---|
| SPM7L1-07-V-3395 | 05/26/07 | $ 21,749.30 | 66% | A16-12244-000 |
| SPM7L1-07-V-3827 | 06/28/07 | $ 13,732.25 | 31% | A16-13412-001 |
| W56HZV-08-P-1106 | 07/01/08 | $ 19,401.20 | 99% | A16-12614-001 |
| SPM7L1-09-M-8942 | 04/29/09 | $ 11,517.12 | 71% | A16-12244-000 |
| SPM7L2-09-M-2246 | 07/01/09 | $ 9,597.60 | 64% | A16-12244-000 |
| W56HZV-09-P-1083-0001 | 12/18/09 | $ 26,594.96 | 91% | A16-12614-001 |
| W56HZV-09-P-1083-0002 | 12/22/09 | $ 21,845.86 | 91% | A16-12614-001 |
| SPM7L2-10-M-3006 | 01/27/10 | $ 10,064.16 | 49% | A16-13412-001 |
| **TOTAL** | | **$ 134,502.45** | | |

4.    **Defendant KPI provided counterfeit heat treatment certifications:**    As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, defendant KPI provided counterfeit heat treatment certifications to the DoD.    As explained above, certain contracts awarded by the DLA required items to be shipped in heat treated wood packaging material (WPM), so that the material would resist parasites and meet international standards regulating WPM.    In contracts requiring heat treated wood packaging material, a contract clause specified the requirement, which included placement of a Heat Treatment (HT) certification stamp on the wood packaging material.

a.    Some of the contracts awarded to defendant KPI and its predecessor SOS contained an HT clause.    In order to decrease costs and increase profits, at the direction of defendant Harold Ray Bettencourt II and on behalf of defendant KPI and its predecessor SOS, defendant Josh Kemp counterfeited an HT certification stamp belonging to Timber Products Inspection, Inc. (Timber Products), a company that provided heat treated WPM and HT certification services.    Defendant KPI and its predecessor SOS then shipped items in non-heat treated WPM while representing that it was heat treated.

b.    On October 29, 2008, Timber Products filed a Civil Complaint in the

23 - INDICTMENT

United States District Court in Eugene, Oregon against SOS in case number 08-6342-TC, alleging trademark infringement, trademark dilution, unlawful trade practices and requesting injunctive relief. The complaint alleged that SOS engaged in the practice of fraudulently taking Timber Products' trademark markings and placing their HT certification on wooden pallets that were subsequently used to ship military supplies to military installations. SOS acknowledged this practice occurred, but claimed that it occurred as a result of an employee of SOS doing so without authorization, direction, knowledge, or consent of SOS management. Contrary to this claim, at the direction of defendant Harold Ray Bettencourt II, defendant Josh Kemp obtained a copy of the Timber Products stencil and had a duplicate made by Action Trophies & Signs in Coos Bay, Oregon. Defendant KPI and its predecessor SOS then used this counterfeit seal to brand WPM so that it would appear to be heat treated. SOS ultimately paid $75,000.00 to Timber Products and $20,000.00 to Action Trophies to settle the trademark infringement matter.

**5.** **Defendant KPI provided defective vehicle maintenance kits:** As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, defendant provided defective vehicle maintenance kits to the DoD. In these kits, approved parts were commingled with non-approved parts, making detection of nonconforming parts much more difficult. Maintenance kits are designed to give maximum efficiency in vehicle maintenance. Each kit contains multiple parts, each of which is necessary. If a necessary part is nonconforming, the kit fails to meet its intended purpose.

a. Between October 6, 2008 and July 10, 2009, defendant KPI was awarded six contracts for maintenance part kits to service Light Medium Tactical Vehicles (LMTV) vehicles, totaling $1,307,728.86. Defendant KPI through defendant Bo Bettencourt caused nonconforming parts to be placed in the maintenance kits to increase its profit margin. As an example, on July 10, 2009, defendant KPI was awarded a contract by the

24 - INDICTMENT

DSCC, Land Supply Chain (contract VIII). The amount of contract VIII was $84,137.25 to supply 255 maintenance part kits at $329.95 each to service LMTVs. Contract VIII specified the approved manufacturer for each part. Each kit contained 18 items, three of which were nonconforming substitute parts. As a result of the substitution of the nonconforming parts, defendant KPI increased its gross profit by approximately $28.84 per kit, for a total of $7,354.20 on contract VIII. Between March 13, 2009 and July 9, 2010, DFAS initiated EFTs to defendant KPI on contract VIII totaling $$1,307,728.86.

   **6.    Defendant KPI provided 136,000 nonconforming self-locking hexagon nuts from Taiwan:** As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, defendant provided 136,000 self-locking hexagon nuts from Taiwan to the DoD:

   a.    On June 19, 2009, defendant KPI was awarded a contract by the DSCP/AD (contract IX). The amount of contract IX was $63,784.00, to supply 136,000 self-locking hexagon nuts. Contract IX specified three approved sources of supply; Caterpillar, Inc., Oshkosh Corporation, or Nacco Materials Handling Group. Defendant KPI through defendant Pete Bettencourt represented to the DoD that it would provide Caterpillar part number 1K6870. Once contract IX was awarded, however, defendant KPI through defendant Pete Bettencourt outsourced the production of these self-locking hexagon nuts to Fisher Products, Inc. (Fisher), an unapproved source of supply. In doing so, defendant KPI never requested OEM parts from Fisher, nor did it inform Fisher that the parts were for DoD contracts. Fisher purchased 138,400 locknuts from a company called Porteous Fasteners. Porteous acquired the locknuts from Taiwan. Defendant KPI then delivered the locknuts to DoD under contract IX and represented them to be Caterpillar part number 1K6870, an approved source of supply. Defendant KPI through Bo Bettencourt purchased the locknuts for about 20 cents each. By purchasing the locknuts for about 20 cents each, defendant KPI had a product mark-up on contract IX of approximately 135%

for a gross profit of at least $37,006.50. Between September 25 and October 13, 2009, DFAS initiated EFTs to defendant KPI on contract IX totaling $64,746.86.

7.      **Defendant KPI provided nonconforming fluid filter elements:**  As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, defendant provided nonconforming fluid filter elements to the DoD:

a.      On January 31, 2008, the DSCC issued a contract solicitation for the acquisition of fluid filter elements for the military land supply chain.  The solicitation was an indefinite quantity contract, based on the military's needs, for a one year period with an additional four year option.  The contract solicitation identified three approved sources of supply: Stewart and Stevenson (now known as BAE Systems Land and Armaments), Graver Technologies, LLC, and Allison Transmission, Inc.  On February 27, 2008, defendant KPI through defendant Bo Bettencourt submitted a quotation which stated that defendant KPI would purchase part number 29501202 from BAE Systems Land and Armaments (BAE).

b.      On September 8, 2008, in response to a request for traceability documents from the DoD, defendant Bo Bettencourt sent a facsimile to the DSCC which stated that defendant KPI would purchase part number 29501202 from BAE, and included a price quotation allegedly obtained from BAE.  Based on this quotation and traceability documentation, defendant KPI was awarded the contract (contract X).  Instead of purchasing the fluid filters from the BAE, defendant KPI through defendant Bo Bettencourt purchased aftermarket products from Defeo Manufacturing, an unapproved source of supply.  Between December 29, 2008 and March 12, 2010, DFAS initiated EFTs to defendant KPI on the three delivery orders under contract X totaling $16,487.30.

c.      On March 3, 2010, due to numerous instances of defendant KPI providing nonconforming parts, the DLA proposed that defendant KPI be debarred from contracting with the DoD.  On July 8, 2010, defendant KPI was debarred from contracting with the

26 - INDICTMENT

DoD for a period of one year. Since defendant KPI had already been awarded contract X, however, on July 21, 2010, a fourth delivery order was awarded under contract X. After being notified of the contract award, defendant Nick Bettencourt requested more than a 25% increase in payment under the contract at which time the DLA rescinded the contract. Between December 29, 2008 and March 12, 2010, DFAS initiated EFTs to defendant KPI on contract X totaling $16,487,30.

8.    **Defendant KPI provided additional nonconforming products from additional unapproved sources of supply:** As part of the scheme and artifice to defraud the DoD and to obtain money and property from the DoD, defendant provided additional nonconforming products to the DoD from over 30 additional unapproved sources of supply. Between May 10, 2006 and December 1, 2010, DFAS initiated EFTs to defendant KPI on additional contracts totaling $5,470,104.34.

9.    **Final payment on fraudulently procured contracts with DoD:** On December 1, 2010, DFAS initiated the final known EFT to defendant KPI for fraudulently procured products on DoD contracts.

All in violation of Title 18, United States Code, Sections 1343 and 1349.

**COUNT 2**
**[WIRE FRAUD – General Scheme]**

The allegations set forth in Count 1 are incorporated herein by this reference. Beginning at an undetermined time and continuing through December 1, 2010, in the District of Oregon and elsewhere, defendants Harold Ray Bettencourt II, Susie Bettencourt, Bo Bettencourt, Nick Bettencourt, Pete Bettencourt, Toni Densmore, Josh Kemp and KPI devised and intended to devise a scheme and artifice to defraud the United States Department of Defense (DoD) and to obtain money and property from the DoD by means of materially false and fraudulent pretenses, representations and promises, well knowing at the time that these pretenses, representations and

27 - INDICTMENT

promises would be and were false and fraudulent when made. For the purpose of executing the scheme and artifice to defraud and to obtain money and property, defendants transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds.

All in violation of Title 18, United States Code, Section 1343.

## COUNTS 3-10
## [WIRE FRAUD - Specific Defendants]

The allegations set forth in Counts 1 and 2 are incorporated herein by this reference. In the District of Oregon, for the purpose of executing the scheme and artifice to materially defraud and obtain money and property from the DoD by means of materially false and fraudulent pretenses and representations, the following defendants on the following dates did transmit and cause to be transmitted in interstate commerce the following wire communications for the purpose of executing the scheme and artifice to materially defraud and obtain money and property from the DoD.

All in violation of Title 18, United States Code, Section 1343.

| Count | Defendant | Date | Type | Description |
|-------|-----------|------|------|-------------|
| 3 | Harold Ray Bettencourt II | 12/06/07 | Email | Message to Titan Hoods/Promotora Expormex representative in Mexico facilitating the manufacture of counterfeit parts supplied to DoD under contract number SPM4A6-08-V-0989 |
| 4 | Susie Bettencourt | 7/25/08 | Wire transfer | $11,693.00 payment to Promotora Expormex in Mexico for counterfeit parts supplied to DoD under contract numbers SPM7L1-08-V-2128 and SPM7M1-08-V-C712 |
| 5 | Susie Bettencourt | 2/23/09 | Wire transfer | $8,730.00 payment to Anhui Weiwei Rubber Parts Co., Ltd., in China for |

28 - INDICTMENT

|   |   |   |   | counterfeit parts supplied to DoD under contract number SPM5L2-09-V-0174 |
|---|---|---|---|---|
| 6 | Bo Bettencourt | 4/29/09 | Facsimile | False traceability documents provided to DLA representative in Philadelphia, Pennsylvania representing that OEM Holland USA, Inc., part number 915-06-003 would be provided under contract number SPM8E6-09-M-1520. |
| 7 | Nick Bettencourt | 1/21/10 | Email | False traceability documents provided to DLA representative in Columbus, Ohio representing that OEM Freightliner LLC part number A16-13412-001 would be provided under contract number SPM7L2-10-M-3006. |
| 8 | Pete Bettencourt | 6/15/07 | Facsimile | False traceability documents provided to DSCR representative in Richmond, Virginia representing that OEM Timken part number 48385 would be provided under contract number SPM4MI-07-Q-4513 |
| 9 | Toni Densmore | 05/21/08 | Email | Message to Lissa Dishner regarding maintenance of defendant KPI software sales summary and invoicing form which facilitated provision of nonconforming products |
| 10 | Josh Kemp | 12/14/07 | Email | Message to Titan Hoods/Promotora Expormex representative in Mexico facilitating the manufacture of counterfeit parts supplied to DoD under contract number SPM4A6-08-V-0989 |

## COUNT 11
### [FRAUD INVOLVING AIRCRAFT PARTS – General Scheme]

The allegations set forth in Counts 1-10 are incorporated herein by this reference.

Beginning at an undetermined time and continuing through December 1, 2010, in the District of

Oregon and elsewhere, defendants Harold Ray Bettencourt II, Nick Bettencourt, Josh Kemp and

KPI, in or affecting interstate or foreign commerce, did knowingly and with intent to defraud make

29 - INDICTMENT

and caused to be made materially false writings, certifications, documents, records, data plates, labels, and electronic communications concerning aircraft parts, to wit,

All in violation of Title 18, United States Code, Section 38(a)(1)(C) and (b)(4).

## COUNTS 12-14
### [FRAUD INVOLVING AIRCRAFT PARTS – Specific Defendants]

The allegations set forth in Counts 1-11 are incorporated herein by this reference. Beginning at an undetermined time and continuing through December 1, 2010, in the District of Oregon and elsewhere, the following defendants on the following dates, in or affecting interstate or foreign commerce, did knowingly and with intent to defraud make and caused to be made the following materially false writings, certifications, documents, records, data plates, labels, and electronic communications concerning aircraft parts:

| Count | Defendant | Date | Description |
|-------|-----------|------|-------------|
| 12 | Harold Bettencourt II | 5/06/09 | Letter mailed to DLA representative in Philadelphia, Pennsylvania providing false information in response to PQDR regarding defective aviation locknuts. |
| 13 | Nick Bettencourt | 4/08/09 | Email message to Cade Technologies representative in Frisco, Texas providing false information to acquire SPS Technologies part number EB 9025-14 self-locking aviation nut. |
| 14 | Josh Kemp | 5/13/09 | Email message to DCMA Quality Assurance Representative in Medford, Oregon providing false information in response to PQDR regarding defective aviation locknuts. |

All in violation of Title 18, United States Code, Section 38(a)(1)(C) and (b)(4).

## COUNT 15
### [CONSPIRACY TO COMMIT MONEY LAUNDERING]

The allegations set forth in Counts 1-14 are incorporated herein by this reference. Beginning at an undetermined time and continuing through December 1, 2010, in the District of

30 - INDICTMENT

Oregon, defendants Harold Ray Bettencourt II, Susie Bettencourt, Bo Bettencourt, Nick Bettencourt, Toni Densmore and KPI did knowingly conspire, confederate and agree with each other and with other persons known and unknown to the grand jury to engage in monetary transactions in criminally derived property of a value greater than $10,000.00 which was derived from specified unlawful activity, to wit, violations of Title 18, United States Code, Section 1343 (wire fraud), knowing that the money involved in the financial transaction represented the proceeds of theft of government funds and wire fraud. In doing so, defendants engaged in 141 monetary transactions totaling $5,547,405.46.

All in violation of Title 18, United States Code, Sections 1956(h) and 1957(a), (b)(1), and (d)(1).

## COUNT 16-20
## [MONEY LAUNDERING]

The allegations set forth in Counts 1-15 are incorporated herein by this reference. On the dates set forth in the following table, in the District of Oregon and elsewhere, defendants Harold Ray Bettencourt II, Susie Bettencourt, Bo Bettencourt and Nick Bettencourt did knowingly engage in monetary transactions in criminally derived property of a value greater than $10,000.00 which was derived from specified unlawful activity, to wit, violations of Title 18, United States Code, Section 1343 (wire fraud), knowing that the money involved in the financial transaction represented the proceeds of wire fraud.

All in violation of Title 18, United States Code, Section 1957(a), (b)(1), and (d)(1).

31 - INDICTMENT

| Count | Defendant | Date | Description |
|-------|-----------|------|-------------|
| 16 | Susie Bettencourt | 08/13/07 | $15,276.40 payment to Harold (Bo) R. Bettencourt III |
| 17 | Susie Bettencourt | 03/11/08 | $17,243.34 payment to Nicholas R. Bettencourt |
| 18 | Bo Bettencourt | 10/30/08 | $15,075.00 transfer to Sterling Savings Bank account 59994266542 for Cedar Creek Land & Cattle Co. |
| 19 | Nick Bettencourt | 03/20/09 | $56,308.56 payment to MAC Motors, Inc. |
| 20 | Harold Ray Bettencourt II | 12/18/09 | $75,233.56 payment to Axletech International |

## FIRST FORFEITURE ALLEGATION

Upon conviction of one or more the offenses set forth in Count 1-10 of this Indictment, the defendants Harold Ray Bettencourt II, Susie Bettencourt, Bo Bettencourt, Nick Bettencourt, Pete Bettencourt, Toni Densmore, Josh Kemp, and KPI, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the wire fraud offenses in violation of Title 18, United States Code, Sections 1343 and 1349. The property to be forfeited includes, but is not limited to, the following:

1.     PROCEEDS:

A sum of money equal to $7,523,406.59 in United States currency, representing the amount of proceeds obtained as a result of the wire fraud and conspiracy to commit the same for which the defendants are jointly and severally liable.

2.     CONVEYANCE

2009 Dodge Challenger, VIN 2B3LJ44V49H561559;

32 - INDICTMENT

2006 Lexus IS 350, VIN JTHBE262365004374;

2010 Customized Peterbilt 389K, Semi Truck, VIN 1NPXGGGG0OD760274;

2006 Dodge Ram Series 3500, VIN 3D7LX38C76G275397;

2007 Dodge Ram 2500, VIN 3D7KS28A67G855406;

2010 Dodge Laramie Ram 2500, VIN 3D7UT2CL0AG158643;

2007 MB Sports Tomcat 23 foot Boat,   Hull No. MBZ03830A707;

2007 Zieman Boat Trailer, VIN 1ZCB24S297Y102519;

Two (2) 2007 Sea-Doo Jet Skies , VIN CA-YDV44946C707 AND CA-YDV44923C707;

2007 Zieman Boat Trailer, VIN 1ZCS160177W330975;

2008 Yamaha 700 Raptor Special Edition All-Terrain Vehicle, VIN JY4AM14Y08C013449 (ATV);

2008 Yamaha 700R Special Edition All-Terrain Vehicle, VIN JY4AM14Y58C013446 (ATV);

2005 Yamaha Banshee All-Terrain Vehicle, VIN JY43GG0315C07744 (ATV);

2008 Chevrolet Silverado Pickup Truck, VIN 1GCHK23618F205618;

2006 H2 Hummer Sports Utility Vehicle, VIN 5GRGN22U16H110821;

and their tools and appurtenances.

3.    CURRENCY

Approximately $ 2,390.00 in United States currency.

4.    BANK ACCOUNTS

$4,944.38 funds seized from Oregon Pacific Bank, Acct #XXX3471;

$50,306.77 funds seized from Oregon Pacific Bank, Acct #XXX4733;

$725.72 funds seized from Wells Fargo Bank, Acct #XXXXXX4671;

$10,595.03 fund seized from Wells Fargo Bank Acct #XXXXXX9738;

$15,482.86 funds seized from Wells Fargo Bank Acct XXXXXX4689;

$4,011.86 funds seized from Sterling Savings Bank Acct #XXXXXXX0816;

$2,477.94 funds seized from Sterling Savings Bank Acct #XXXXXXX3026;

$665.49 in funds from Sterling Savings Bank Acct #XXXXXXX8714;

$2,803.46 funds seized from Sterling Savings Bank, Acct #XXXXXXX6542;

$201.98 funds seized from Sterling Savings Bank Acct #XXXXXXX7147;

$200,727.02 in Funds Seized from Sterling Savings Bank, Account #XXXXXXX0485;

$10,349.55 in Funds Seized from Sterling Savings Bank, Account #XXXXXXX4703;

$14,713.58 funds seized from Wells Fargo Bank Acct #XXXXXX5173;

$12,988.16 seized from Oregon Pacific Bank Acct #XXX4800;

$485.73 seized from Oregon Pacific Bank Acct #XXX1243;

$175.23 seized at Sterling Savings Bank Acct #XXXXXXX0764;

$2,501.15 funds seized from Sterling Savings Bank Acct #XXXXXXX3893;

$1,272.95 funds seized from Sterling Savings Bank Acct #XXXXXXX0857;

$25,052.13 funds seized from Sterling Savings Bank Acct #XXXXXXX0556;

$5,022.27 funds seized from Sterling Savings Bank Acct #XXXXXXX7966.

5.      If any of the forfeitable property described above, as a result of any act or omission

of the defendants:

a.      cannot be located upon the exercise of due diligence,

b.      has been transferred or sold to, or deposited with, a third party,

c.      has been placed beyond the jurisdiction of the court,

d.      has been substantially diminished in value, or

e.      has been commingled with other property which cannot be divided without

34 - INDICTMENT

difficulty,

it is the intent of the United States, pursuant to Title 21 United States Code, Section 853(p) as incorporated by Title 18 United States Code, Section 982(b), to seek forfeiture of any other property of said defendant(s) up to the value of the forfeitable property described above.

## SECOND FORFEITURE ALLEGATION

Upon conviction of one or more the offenses in violation of Title 18, United States Code, Section 38 set forth in Count 11-14 of this Indictment, the defendants Harold Ray Bettencourt II, Nick Bettencourt, Josh Kemp and KPI shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 38, any property which constitutes or is derived from any proceeds obtained directly or indirectly as a result of the offense and any property used, or intended to be used in any manner, to commit or facilitate the commission of the offense.  The property to be forfeited includes, but is not limited to, the following:

1.    PROCEEDS:

A sum of money equal to $113,892.40 in United States currency, representing the amount of proceeds obtained as a result of the fraud involving aircraft parts for which the defendants are jointly and severally liable.

2.    BANK ACCOUNTS

$10,349.55 in Funds Seized from Sterling Savings Bank, Account #XXXXXXXX4703.

3.    If any of the forfeitable property described above, as a result of any act or omission of the defendants:

   a.    cannot be located upon the exercise of due diligence,

   b.    has been transferred or sold to, or deposited with, a third party,

   c.    has been placed beyond the jurisdiction of the court,

35 - INDICTMENT

d.  has been substantially diminished in value, or

e.  has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendant(s) up to the value of the forfeitable property described above.

## THIRD FOREITURE ALLEGATION

Upon conviction of one or more of the offenses alleged in Count 15-20 of this Indictment, defendants Harold Ray Bettencourt II, Susie Bettencourt, Bo Bettencourt, Nick Bettencourt, Toni Densmore and KPI shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

1.  PROCEEDS:

A sum of money equal to $5,547,405.46 in United States currency, representing the amount of proceeds obtained as a result of the money laundering and conspiracy to commit the same for which the defendants are jointly and severally liable.

2.  BANK ACCOUNTS

$10,349.55 in Funds Seized from Sterling Savings Bank, Account #XXXXXXXX4703.

3.  If any of the forfeitable property described above, as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due diligence,

b.  has been transferred or sold to, or deposited with, a third party,

36 - INDICTMENT

      c.     has been placed beyond the jurisdiction of the court,

      d.     has been substantially diminished in value, or

      e.     has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendant(s) up to the value of the forfeitable property described above.

Dated this ___14___ day of December, 2011.

A TRUE BILL.

/s/GRAND JURY FOREPERSON
FOREPERSON

Presented by:

S. AMANDA MARSHALL
United States Attorney

/s/Sean B. Hoar
SEAN B. HOAR
Assistant United States Attorney

37 - INDICTMENT